1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9    El Paso Natural Gas Company LLC,          No. CV-14-08165-PCT-DGC

10               Plaintiff,                    **ORDER**

11   v.

12   United States of America, et al.,

13               Defendants.

14

15

16          Plaintiff El Paso Natural Gas Company LLC brings claims against Defendants

17   United States of America, the Department of the Interior, the Bureau of Indian Affairs,

18   the U.S. Geological Survey, the Department of Energy, and the Nuclear Regulatory

19   Commission (collectively, the "United States") under §§ 107 and 113 of the

20   Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).

21   El Paso seeks to recover response costs incurred in remediating 19 historical uranium

22   mines located on the Navajo Reservation (the "Mine Sites").  Doc. 55, ¶¶ 1-2.

23          El Paso has moved for summary judgment on its claim that the United States is an

24   "owner" of the Mine Sites under CERCLA.  The Court previously resolved some of the

25   arguments made in the parties' summary judgment briefing, but called for additional

26   briefing on the owner issue.  *See El Paso Nat. Gas Co. LLC v. United States*, No. CV-14-

27   08165-PCT-DGC, 2017 WL 2405266 (D. Ariz. June 2, 2017).  The parties have now

28   provided further briefing.  Docs. 130, 133.

The parties stipulate that the United States has owned fee title to the Mine Sites since at least 1952. Doc. 83, ¶¶ 23-24. The United States argues, nonetheless, that is not an owner within the meaning of CERCLA because its ownership interest is limited – it holds reservation land in trust for the benefit of the Navajo Nation.

After considering the broad remedial purposes of CERCLA, the ordinary meaning of property ownership, the nature of the Navajo Nation and United States interests in reservation land, and other relevant authorities, the Court concludes that the United States is an owner under CERCLA. Because further factual development is needed, the Court cannot at this time determine whether the United States is entitled to a limit on its liability under CERCLA § 107(n) based on its role as a fiduciary.

## I. CERCLA Owner.

The Court's previous order noted that the Ninth Circuit has looked to the relevant common law to identify an owner under CERCLA, and directed the parties to brief the federal law that applies to reservation lands. *El Paso*, 2017 WL 2405266 at *5-6. Although the Court continues to find federal statutory and common law relevant, and will consider it in this order, the Court also concludes that the remedial purposes of CERCLA and the ordinary meaning of property ownership are important in this case. The Ninth Circuit cases cited in the Court's previous order considered whether a person other than the fee title holder could be an owner under CERCLA, and looked to common law for the answer. *See Long Beach Unified Sch. Dist. v. Dorothy B. Godwin California Living Tr.*, 32 F.3d 1364 (9th Cir. 1994); *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440 (9th Cir. 2011). The question in this case is the reverse – whether a fee title holder can be deemed a non-owner for purposes of CERCLA. On this basic question, and after reviewing the parties' supplemental briefing, the Court finds the purposes of CERCLA and the ordinary meaning of "owner" to be highly relevant, as did the Tenth Circuit in the recent case of *Chevron Mining Inc. v. United States*, --- F.3d ---, 2017 WL 3045887, at *7 (10th Cir. July 19, 2017).

## A. The Purpose of CERCLA.

The Court's conclusion that the United States is an owner under CERLCA is strongly influenced by the approach CERCLA takes to environmental cleanup. CERCLA seeks "to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 602 (2009) (citation omitted). To accomplish this goal, CERCLA casts the liability net broadly, capturing virtually everyone connected with the property or the contamination, with specific levels of responsibility to be assigned by the court in an equitable allocation process. As the Supreme Court has explained, "[t]he remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998) (emphasis in original; citation omitted). Liable parties include entities and individuals who may have had little or nothing to do with the actual contamination. **"**CERCLA is a strict liability statute in that it does not require a party to act culpably in order to be liable for clean up." *Voggenthaler v. Maryland Square LLC*, 724 F.3d 1050, 1061 (9th Cir. 2013). To achieve CERCLA's broad remedial goals, courts interpret the statute "liberally." *Id.* at 1064.

There are four types of persons liable under CERCLA: owners, operators, arrangers, and transporters. 42 U.S.C. § 9607(a). These are "broad categories" of liable persons, *United States v. Atl. Research Corp.*, 551 U.S. 128, 134 (2007), and they can include the United States. Under § 9620(a)(1) of CERCLA, "[e]ach department, agency, and instrumentality of the United States . . . shall be subject to . . . this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title." 42 U.S.C. § 9620(a)(1). This provision waives sovereign immunity to the extent the United States is a liable party under CERCLA. *El Paso*, 2017 WL 2405266 at *2-4.

## B. The Ordinary Meaning of "Owner."

CERLA defines "owner" as "any person owning" a facility. 42 U.S.C. § 9601(20)(A). This definition, of course, is circular. As the Ninth Circuit has noted, it "is a bit like defining 'green' as 'green.'" *Long Beach*, 32 F.3d at 1368. When a statute provides such a circular definition of a term, courts normally look to the term's plain and ordinary meaning. *Id.*

The ordinary meaning of the word "owner" is the person or entity which holds title to property. As the Tenth Circuit recently noted in *Chevron Mining*, "[t]he ordinary or natural meaning of 'owner' includes, at a minimum, a legal title holder." 2017 WL 3045887 at \*7; *see also Own*, Black's Law Dictionary (10th ed. 2014) ("To rightfully have or possess as property; to have legal title to."); *Owner,* Black's Law Dictionary (10th ed. 2014) ("Someone who has the right to possess, use, and convey something; a person in whom one or more interests are vested. An owner may have complete property in the thing or may have parted with some interests in it (as by granting an easement or making a lease)."). "Dictionaries published around the time of CERCLA's enactment in 1980 affirm this natural meaning." *Chevron Mining*, 2017 WL 3045887 at 7; *see Own*, Black's Law Dictionary (5th ed. 1979) ("To have good legal title; to hold as property; to have a legal or rightful title to; to have; to possess."); *Owner*, Black's Law Dictionary (5th ed. 1979) ("The person in whom is vested the ownership, dominion, or title of property; proprietor."). "For purposes of CERCLA, then, an owner includes the legal title holder of contaminated land." *Chevron Mining*, 2017 WL 3045887 at \*7. Because the United States holds legal title to the Mine Sites, it is the owner of the Mine Sites under the ordinary meaning of "owner."

## C. The Nature of Reservation Land.

The Court's review of federal law does not alter this conclusion.

### 1. United States Fee Title.

The longstanding law in this country holds that the United States owns fee title to reservation land. *Oneida Indian Nation of N. Y. State v. Oneida Cty., New York*,

- 4 -

414 U.S. 661, 667 (1974) ("fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign – first the discovering European nation and later the original States and the United States").  The tribes retained a limited right of occupancy, often referred to as "Indian title," that could be extinguished only by the United States and continued only at the pleasure of the United States.  *Id.*; *United States v. Newmont USA Ltd.*, 504 F. Supp. 2d 1050, 1062 (E.D. Wash. 2007).  Over the years, the federal government entered treaties, issued executive orders, and passed legislation affecting, clarifying, and guaranteeing rights to reservation land.  Additionally, the position of the United States began to be construed as a trust relationship, with the United States holding land in trust for the benefit of the tribes.  Cohen's Handbook of Federal Indian Law §§ 15.03, 15.09[1][b] at 997, 1053 (Nell Jessup Newton et al. eds., 2012).  The precise nature of tribal land rights depends on the language of the instrument used to convey or consolidate them.  *See Hynes v. Grimes Packing Co.*, 337 U.S. 86, 103-04 (1949); *Healing v. Jones*, 174 F. Supp. 211, 216 (D. Ariz. 1959).

### 2.      The Nation's Interest in Reservation Land.

In 1868, the United States entered into a treaty granting the Navajos a reservation in the northeast corner of Arizona.  *Sekaquaptewa v. MacDonald*, 619 F.2d 801, 803 (9th Cir. 1980).  The reservation was expanded through various executive orders between 1880 and 1918.  *Id.*  The Mine Sites are all located on portions of the reservation set aside through executive order.  Doc. 133 at 10.

An unconfirmed executive order granting reservation land does not convey any compensable right to native Americans.  *See Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 285 (1955); *Healing*, 174 F. Supp. at 216 ("An unconfirmed executive order creating an Indian reservation conveys no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President.").  Rights to reservation land granted by treaty or statute, however, do grant compensable rights under the Fifth Amendment. *United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 687 (9th Cir. 1976).

1      In 1934, Congress passed legislation to "consolidate land ownership within the

2 boundaries of the [Navajo] Reservation." *Sekaquaptewa*, 619 F.2d at 804. In addition to

3 delineating reservation borders, the 1934 Act made clear that the land was "permanently

4 withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other

5 Indians as may already be located thereon." 48 Stat. 960. The statute permanently set

6 aside reservation land for use and enjoyment of the Navajo Nation. The legislation

7 therefore granted the Nation a compensable interest in all reservations lands, including

8 those where the Mine Sites are located.[1]

9      The Supreme Court has made clear that "[a]lthough the United States retained the

10 fee, and the tribe's right of occupancy was incapable of alienation or of being held

11 otherwise than in common, that right is as sacred and as securely safeguarded as is fee

12 simple absolute title." *United States v. Shoshone Tribe of Indians of Wind River*

13 *Reservation in Wyoming*, 304 U.S. 111, 117 (1938). But while this could support an

14 argument that the Navajo Nation should be considered an owner of reservation land

15 under CERCLA, that is not an issue before the Court. Tribes are exempt from CERCLA

16 liability. *Pakootas v. Teck Cominco Metals, Ltd.*, 632 F. Supp. 2d 1029, 1035 (E.D.

17 Wash. 2009). The question in this case is whether the United States is an owner of the

18 tribal land for purposes of CERCLA.

19      The fact that the Navajo Nation has significant rights in reservation land does not

20 answer the question in this case. Even if we assume the Nation could be considered an

21 owner under CERCLA (a question the Court need not decide), the Court is aware of no

22 authority suggesting that the United States could not also be an owner. To the contrary,

23 CERCLA itself recognizes that there may be more than one owner of a covered facility.

24 *See* 42 U.S.C. § 9608(b)(4) ("Where a facility is owned or operated by more than one

25

26      [1] Portions of the land covered by the 1934 Act are reserved for other tribes,
including the Hopi. *See Sekaquaptewa*, 619 F.2d at 803. The history and relationship of
27 the tribes' rights to the land is long and complicated. Because the land rights of the tribes
in relation to one another – rather than in relation to the United States – are not relevant
28 to this case, the Court will refer only to the Navajo Reservation and Navajo land rights.

1   person, evidence of financial responsibility covering the facility may be established and

2   maintained by one of the owners or operators, or, in consolidated form, by or on behalf of

3   two or more owners or operators."). And if there could be only one owner of a facility

4   under CERCLA, the Ninth Circuit would not have considered whether holders of

5   easements and revocable permits could, in addition to the fee title holders, be considered

6   owners of property under CERCLA. *See Long Beach*, 32 F.3d 1364; *San Pedro*, 635

7   F.3d 440.[2]

8       It should also be noted that although the United States is said to hold the land in

9   trust for the Nation, the trustee-beneficiary relationship "is not comparable to a private

10  trust relationship." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 173 (2011).

11  "Congress may style its relations with the Indians a 'trust' without assuming all the

12  fiduciary duties of a private trustee, creating a trust relationship that is 'limited' or 'bare'

13  compared to a trust relationship between private parties at common law." *Id.* at 174.

14              **3.      The United States Retains Power Over Reservation Land.**

15      "Throughout the history of the Indian trust relationship, we have recognized that

16  the organization and management of the trust is a sovereign function subject to the

17  plenary authority of Congress." *Id*. at 175. "Congress possesses a paramount power over

18  the property of the Indians, by reason of its exercise of guardianship over their

19  interests[.]" *United States v. Sioux Nation of Indians*, 448 U.S. 371, 408 (1980) (citation

20  and quotation marks omitted, alterations incorporated); *see also Winton v. Amos*, 255

21  U.S. 373, 391 (1921) ("It is thoroughly established that Congress has plenary authority

22  over the Indians . . . and full power to legislate concerning their tribal property"); *S. Pac.*

23  *Transp. Co.*, 543 F.2d at 687 ("the Indians have the exclusive right to possession but title

24  to the lands remains with the United States. Congress has plenary authority to control

25  use, grant adverse interests or extinguish the Indian title."). Thus, while the Navajo

26  Nation was granted exclusive use and occupancy of the reservation, this use and

27              [2] The United States agrees that "[m]ultiple people and/or entities can hold absolute
28  rights – the entire bundle of sticks – in a property and multiple people and/or entities can
    hold absolute rights in distinct parts of a property." Doc. 133 at 15 (parentheticals
    omitted).

- 7 -

occupancy is enjoyed "under general federal supervision." *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 174-75 (1973).

And beyond its supervisory and plenary power, the United States has reserved other specific powers with regard to reservation land.

First, although the Navajo Nation has the authority to exclude others from the reservation, this authority does not apply against the United States. Tribes "may exclude private individuals from the territory within [their respective] jurisdiction[s], or prescribe the conditions upon which such entry will be permitted," but this power of exclusion "has been superseded by many statutes authorizing and directing officers and agents of the United States to enter upon Indian lands for various purposes." *Powers of Indian Tribes,* 55 I.D. 14, 1934 WL 2186, at * 49 (1934). The 1868 Treaty provided that "'officers, soldiers, agents, and employees of the government . . . shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.'" *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 174 (1973) (quoting Treaty with the Navajo Nation, 15 Stat. 668.). This language does not appear in the 1934 Act, but Congress, as shown by the law quoted above, retains plenary power over reservation lands, including the power of access by the federal government.

Second, Congress has restricted the alienability of tribal lands, providing that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. Thus, no interest in land possessed by a tribe may be conveyed without approval of the federal government. The United States emphasizes that this limitation on alienation was enacted "to promote and protect tribal sovereignty and self-determination" (Doc. 133 at 12 n.6), but whatever the rationale, the fact remains that the United States exercise control over the power to alienate tribal land, an important property right.[3]

---

[3] The United States cites a 1934 opinion from the Solicitor of the Department of the Interior for the proposition that tribes retain substantial sovereign powers. But that same opinion recognizes that tribal powers may be limited by Congress or by treaties

### 4. The Nation's Compensable Interest.

The United States also emphasizes that a tribe's interest in land conferred through statute or treaty is protected from uncompensated taking by the Fifth Amendment. *See United States v. Creek Nation*, 295 U.S. 103, 109-10 (1935).[4] But the Court cannot conclude that the Nation's right to compensation for taking of tribal lands means that the United States is not an owner of those lands. The fact that a party has a compensable interest in land does not mean there is no other owner. For example, an easement holder has a compensable property interest under the Fifth Amendment, *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 627 (1961), and yet it cannot reasonably be argued that the existence of that interest negates the fee title holder's position as owner of the property.

### 5. Conclusion.

While the United States has granted a significant property interest to the Navajo Nation – exclusive use and possession of reservation land, amounting to a compensable interest – the fact remains that the United States holds fee title and substantial powers over the land, including the power to enter, control alienation, and take. Given CERCLA's broad remedial purposes, its simple declaration that facility owners are liable, and the Court's obligation to construe "owner" liberally, *Voggenthaler*, 724 F.3d at 1064, the Court concludes that a fee title holder with such plenary and supervisory powers is an owner for purposes of CERCLA.

---

with the federal government: "The powers of sovereignty have been limited from time to time by special treaties and laws designed to take from the Indian tribes control of matters which, in the judgment of Congress, these tribes could no longer be safely permitted to handle. The statutes of Congress, then, must be examined to determine the limitations of tribal sovereignty[.]" *Powers of Indian Tribes*, 1934 WL 2186, at *4 (1934).

[4] This Constitutional protection apparently applies only to actions taken by the United States for its own purposes, rather than for the benefit of the tribe at issue. "Because the government operates as both a trustee and a sovereign with regard to Indian tribes, an action depriving a tribe of property that would be a per se taking under the Court's takings clause jurisprudence may be held to be the action of a trustee and therefore not a taking." Cohen's Handbook of Federal Indian Law § 5.04[2][c] at 410 (Nell Jessup Newton et al. eds., 2012).

### D. Supporting Case Law.

The Tenth Circuit's recent decision in *Chevron Mining* strongly supports this conclusion. *Chevron Mining* considered whether the United States is a CERCLA owner of land subject to unpatented mining claims. 2017 WL 3045887, at *7.

The General Mining Act of 1872 allows citizens to exploit mineral deposits under the public lands of the United States. If citizens discover valuable mineral deposits, they may take certain steps to obtain an unpatented claim to the relevant public land. *Id.* The holder of such a claim does not obtain title, but does obtain the exclusive right to use and possess the land. *Id.* As with tribal lands, "the holder of an unpatented claim has superior rights as against third parties," but not against the United States, which retains fee title and plenary power over the land. *Id.* at *7, 9. If the holder of an unpatented claim exercises his statutory right and follows required procedures, he can acquire a patented mining claim which includes fee title. *Id.*

In *Chevron*, the contamination was located on land subject to unpatented mining claims. The mining company admitted its liability under CERCLA, and sued the United States as an owner of the land. The situation was very similar to this case – the holder of the unpatented claims, like the Nation, possessed the exclusive right to possession and control of the land under federal law, and the United States held fee title and retained some powers over the land. The Tenth Circuit held that the United States was an owner under CERLA. In reaching this conclusion, the court noted that "[t]he ordinary or natural meaning of 'owner' includes, at a minimum, a legal title holder." *Id.* at *7. It emphasized that CERCLA provides broad liability with only a few limited exceptions, *id.* (citing exceptions at 42 U.S.C. § 9601(20)), and that it specifically provides for United States liability as both an owner and an operator, *id.*, at *8 (citing 42 U.S.C. § 9605(a)). Finding that CERCLA envisions liability even for those who did not contribute to contamination, the Tenth Circuit concluded that CERCLA imposed liability on the

1    United States as the fee title owner of unpatented mining claims, even if it could be

2    argued that the United States held only "bare legal title." *Id.* at 8, 10.[5]

3         The United States' status as an owner is also supported by dicta from the Ninth

4    Circuit stating that the "CERCLA framework holds liable . . . the passive *title* owner of

5    real property[.]" *San Pedro*, 635 F.3d at 451-52 (emphasis in original).  It also comports

6    with the *Newmont* case cited above, where the district court held that the United States

7    was a CERCLA owner of the Spokane Indian Reservation.  504 F. Supp. 2d at 1065.

8    *Newmont* is somewhat distinguishable from this case because the Spokane Reservation

9    was created by executive orders that did not convey a compensable interest in the land.

10   *Id.* at 1062-64, 1065.  But *Newmont* appears to be the only other published case to

11   consider whether the United States is a CERCLA owner of reservation lands, and held

12   that it is.  *Newmont* aptly observed that "the drafters of CERCLA [appeared] to intend

13   that land held by the United States in trust for Indians be treated the same as land owned

14   in fee simple by the United States." *Id.* at 1075.

15       **E.    Allocation Remains Ahead**

16       As noted above, Congress designed CERCLA to cast the liability net broadly,

17   capturing virtually everyone connected with the property or the contamination and then

18   sorting out levels of responsibility in an equitable allocation phase.  *See* 42 U.S.C.

19   § 9613(f)(1).  The Court's holding that the United States is an owner, therefore, does not

20   decide the extent of its liability for contamination at the Mine Sites.  As the Tenth Circuit

21   explained in *Chevron Mining*: "a 'bare legal title' holder may in fact be liable for only a

22   small, or perhaps no, share of remediation costs as a matter of equity.  But a liberal

23   construction of CERCLA's liability scheme requires any consideration of the extent and

24   kind of an owner's involvement in hazardous substance production and disposal be made

25   _____

26       [5] The United States' response to El Paso's motion for summary judgment relied
27   heavily on the site control test for determining CERCLA ownership, as adopted in *United
     States v. Friedland*, 152 F. Supp. 2d 1234 (D. Colo. 2001), and other cases.
     Doc. 119 at 16-20.  *Chevron Mining* rejected *Friedland* and the site control test.  2017
28   WL 3045887, at *9-10.  This Court's previous order also found that the site control test
     has been rejected by the Ninth Circuit.  *See El Paso*, 2017 WL 2405266, at *5-7.

1    at the second stage of the CERCLA liability inquiry (*i.e.*, allocation under 42 U.S.C.

2    § 9613(f)(1)), rather than the first (*i.e.*, precluding 'owner' liability entirely)." 2017 WL

3    3045887, at *10.

4    **II.    Limits of Fiduciary Liability.**

5            CERCLA provides that "[t]he liability of a fiduciary under any provision of this

6    chapter for the release or threatened release of a hazardous substance at, from, or in

7    connection with a vessel or facility held in a fiduciary capacity shall not exceed the assets

8    held in the fiduciary capacity." 42 U.S.C. § 9607(n)(1). Because the United States holds

9    Navajo land in trust and the land is inalienable, the United States argues, there are no

10   trust assets with which the liability of the United States can be satisfied. Doc. 119 at 22.

11   But the content of the trust is not clear to the Court. El Paso asserts that the trust includes

12   "all Navajo land and revenues." Doc. 123 at 14. The United States has not shown that

13   the trust is limited to the land itself or that any costs allocated to the United States could

14   not be covered by trust assets.

15           Further, the limitation of liability to trust assets "does not apply to the extent that a

16   person is liable under this chapter independently of the person's ownership of a vessel or

17   facility as a fiduciary or actions taken in a fiduciary capacity." 42 U.S.C. 9607(n)(2). El

18   Paso claims that the United States is also liable in this case as an operator and arranger,

19   claims that must be resolved at trial. *See* Doc. 55 at 27-29. The fiduciary limit of

20   § 107(n) will not apply to any liability of the United States on these grounds.

21           Given this state of the case, the Court concludes that the effect of § 107(n) is better

22   left to trial. The Court will not hold at this time that the United States, as a liable owner

23   of the Mine Sites, has no equitable share of the response costs. *See* Doc. 119 at 22-23.

24           El Paso argues that CERCLA's limitations on the liability of fiduciaries does not

25   apply because the statute explicitly excludes a person who "acts in a capacity other than

26   that of a fiduciary or in a beneficiary capacity; and in that capacity, directly or indirectly

27   benefits from a trust or fiduciary relationship[.]" 42 U.S.C. § 9607(n)(7)(A). El Paso

28   contends that the United States Atomic Energy Commission "acted in a capacity other

than a fiduciary during its mining activities at the Mine Sites, and "benefited by receiving uranium ore needed to win the Cold War." Doc. 114 at 19. As a result, any limitations on liability established by § 107(n) are "abrogated," according to El Paso. *Id.*

If El Paso is asking the Court to decide this issue on summary judgment, it has not met its burden of showing that the United States acted in a role other than as a fiduciary. If the United States is to be liable beyond the assets held in the trust based on its status as an owner of the Mining Sites, it would appear that El Paso must show that the United States' actions *as an owner* exceeded its fiduciary role. El Paso has not established what actions of the United States as an owner were taken outside its fiduciary role. Thus, the Court cannot conclude at this time that § 107(n) does not apply to the United States' liability as an owner of the Mine Sites.

El Paso additionally relies on the Restatement (Second) of Trusts to argue that the United States' liability is not limited to trust assets. But the trust relationship between the United States and the tribes "is defined and governed by statutes rather than common law." *Jicarilla Apache Nation*, 564 U.S. at 174. Because § 107(n) explicitly lays out the limitations on CERCLA liability of fiduciaries, the Court is not inclined to look to contrary common law rules. El Paso also cites *City of Phoenix, Ariz. v. Garbage Servs. Co.*, 816 F. Supp. 564, 567 (D. Ariz. 1993), to argue for extending the United States' liability beyond the assets of the trust, but that case was decided before Congress enacted § 107(n). *See* Pub. L. No. 104-208, § 2502, 110 Stat. 3009 (1996).

**IT IS ORDERED** that El Paso's motion for partial summary judgment (Doc. 114) is **granted** in part as set forth above. The Court finds that the United States is an owner of the Mine Sites for purposes of CERCLA. The Court will schedule a telephone conference to set a trial date and discuss pretrial procedures.

Dated this 15th day of August, 2017.

David G. Campbell
United States District Judge

- 13 -